UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cindy Larson,

        Plaintiff,

v.                                                    Civil No. 13-1506 (JNE/SER)

Arthur J. Gallagher & Co. and Risk
Placement Services, Inc.,

        Defendants.
                                                      ORDER
Michele Dau,

        Plaintiff,

v.                                                    Civil No. 13-1560 (JNE/SER)

Arthur J. Gallagher & Co. and Risk
Placement Services, Inc.,

        Defendants.

---

Joni M. Thome, Baillon Thome Jozwiak & Wanta, LLP, appeared for Plaintiffs Cindy
Larson and Michele Dau.

Patrick R. Martin and Jody A. Ward-Rannow, Ogletree, Deakins, Nash, Smoak &
Stewart P.C., appeared for Defendants Arthur J. Gallagher & Co. and Risk Placement
Services, Inc.

---

      Arthur J. Gallagher & Co. (Gallagher) is an international brokerage and risk

management services firm.  Risk Placement Services, Inc. (RPS), a subsidiary of

Gallagher, is a wholesale broker that handles general casualty, workers' compensation,

property, professional liability, transportation, and personal lines of insurance.  In 2007,

RPS acquired the Robert A. Schneider Agency, Inc. (Schneider Agency).  Michele Dau

started to work at the Schneider Agency in 1994.  After the acquisition, Dau continued to

work for RPS until her termination in August 2012.  She was 64 years old when she was

terminated.  Cindy Larson started to work at the Schneider Agency in 2002.  After the

acquisition, she continued to work for RPS until her termination in May 2012.  She was

51 years old when she was terminated.

After their terminations, Larson and Dau brought separate actions in state court

against Gallagher and RPS.  Larson and Dau asserted claims under the Minnesota Human

Rights Act (MHRA) of discrimination and hostile work environment based on sex, sexual

harassment, reprisal discrimination, and age discrimination.  After Gallagher and RPS

had removed the actions from state court, they moved to dismiss all claims except those

of age discrimination.  The Court granted their motions.  The cases are before the Court

on Gallagher and RPS's motions for summary judgment on Larson's and Dau's

remaining claims of age discrimination.  For the reasons set forth below, the Court grants

the motions.

Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a

party must cite "to particular parts of materials in the record," show "that the materials

cited do not establish the absence or presence of a genuine dispute," or show "that an

adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider

other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether

summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The MHRA provides that it is "an unfair employment practice" for an employer, "[e]xcept when based on a bona fide occupational qualification," to "discharge" an employee "because of" her age.  Minn. Stat. § 363A.08, subd. 2 (2012) (amended 2014). "Claims under the MHRA, not involving direct evidence of discriminatory animus, are subject to the three-part burden-shifting framework set forth" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 918 (Minn. 2012).  Under this framework, the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff does so, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the defendant does so, the plaintiff must demonstrate that the proffered reason was pretext for discrimination. *Hansen*, 813 N.W.2d at 918.

According to Gallagher and RPS, neither Larson nor Dau has direct evidence of age discrimination, and neither Larson nor Dau can demonstrate that the legitimate, nondiscriminatory reasons for their terminations were pretexts for age discrimination. Gallagher and RPS maintained that Larson and Dau must show that age was the "but for" cause of their terminations.  Larson and Dau responded that they satisfied their burdens under the framework set forth in *McDonnell Douglas* and that they need only show that age was a motivating factor in their terminations.

Noting the similarities between the MHRA and the Age Discrimination in Employment Act (ADEA), Gallagher and RPS asserted that Larson and Dau must show that age was the "but for" cause of their terminations.  Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1) (2012).  In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Supreme Court interpreted "because of" in the ADEA to require "but for" causation:

> The words "because of" mean "by reason of: on account of."  Thus, the ordinary meaning of the ADEA's requirement that an employer took adverse action "because of" age is that age was the "reason" that the employer decided to act.  To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision.

557 U.S. at 176 (citations omitted).

Although the similarities between the MHRA and the ADEA generally allow for comparable treatment of claims of age discrimination under the statutes, *see Chambers v. Travelers Cos.*, 668 F.3d 559, 566 (8th Cir. 2012); *Loeb v. Best Buy Co.*, 537 F.3d 867, 875 n.4 (8th Cir. 2008); *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152 (8th Cir. 2007), the Minnesota Supreme Court has not addressed *Gross*.  Anti-discrimination statutes in states other than Minnesota are similar to the ADEA, and they have not necessarily been interpreted in the same manner that the Supreme Court interpreted the ADEA in *Gross*.  *See Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013) (noting the Iowa Civil Rights Act and the ADEA "provide a right of action for an

employee who is terminated 'because of' his age" and "require slightly different showings of causation"); *Clark v. Matthews Int'l Corp.*, 639 F.3d 391, 398 (8th Cir. 2011) (noting that "[t]he [Missouri Human Rights Act] and the ADEA are worded similarly" and that a plaintiff "is not required to prove that age was the 'but for' cause" of an adverse employment action under the Missouri Human Rights Act); *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 514-15 (8th Cir. 2011) ("In a 'pretext' case, such as this one, the Iowa Supreme Court's interpretation of the ICRA arguably creates a lower standard than the Supreme Court's interpretation of the ADEA."). Ultimately, the Court need not resolve the parties' dispute about whether the MHRA requires a plaintiff to show "but for" causation.  Under either standard advanced by the parties, the result is the same.  *Cf. Goins v. W. Grp.*, 635 N.W.2d 717, 722 (Minn. 2001) (stating that a plaintiff claiming disparate treatment must show the protected trait actually motivated the employer's decision); *Friend v. Gopher Co.*, 771 N.W.2d 33, 37 (Minn. Ct. App. 2009) ("Friend asserted her discrimination claim under a disparate-treatment theory, which required her to prove that her pregnancy 'actually motivated' Gopher's decision to terminate her employment.").

### *Larson*

Larson worked at the Schneider Agency and RPS as an underwriter.  RPS offered the following legitimate, nondiscriminatory reasons for her termination:

> Larson was not meeting performance expectations for producers.  Her revenue at all times fell below four times her salary to be profitable and even three times her salary to break even.  Larson **never** met those numbers. . . .

> In addition to the fact that Larson was not profitable, she refused to follow RPS's strategic plan for Minnesota . . . .  She focused on binding large premium accounts that made little revenue for RPS. . . .  Larson repeatedly failed to meet her revenue target.  Similarly, clients repeatedly complained about Larson's lack of responsiveness, and a significant client did not want to work with her on a new project.

The parties disputed whether Larson demonstrated that RPS's reasons for her termination were pretexts for age discrimination.  Larson asserted that RPS's primary reason for her termination, lack of profitability, is not credible; that several facts relating to her lack of profitability are disputed; that she had a good performance record; and that RPS treated younger, similarly-situated employees better than her.

For the last several years of her employment, Larson focused on workers' compensation insurance.  In her 2009-10 performance review, which Larson and Schneider signed on March 29, 2010, Schneider acknowledged that Larson "built [the] Work Comp program from scratch," "took a product line which most brokers will not consider and [grew] it to over $1,000,000 in premium," and "helped other offices start to write work comp."  He noted that Larson "need[ed] to focus on what will make us successful and not chasing unprofitable opportunities."  In his comments on Larson's career goals, Schneider wrote, "Grow the program to be a profitable self sustaining part of the office."  In Larson's 2010-11 performance review, which she and Matthew Lynch[1] signed on March 31, 2011, Lynch noted that Larson's "earned revenue" had increased by 43.80% to $111,644.  He also noted that she had "[f]ailed to make a profit in the

---

[1]     In anticipation of the sale of the Schneider Agency, Schneider hired Lynch with the expectation that Lynch would ultimately manage the office.  Lynch's role was announced approximately one year after the sale.

department."  Her overall rating was "Valued Talent."  In Larson's 2011-12 performance

review, Lynch noted that Larson's revenue had increased by $58,648 to $170,293, that

Larson had "worked hard to increase volume in a very competitive marketplace," and that

Larson "[s]till has been unable to get the Work Comp department profitable."  In her

comments, Larson claimed total revenue of $226,890.  Her performance rating was

"Does Not Meet Expectations," and her overall rating was "Less Effective Talent."

On April 23, 2012, RPS placed Larson on a 30-day performance improvement

plan.  The plan stated that Larson had "worked to make Work Comp a stand alone

profitable portion of RPS Minneapolis"; that "[w]e have made great progress but we still

fell way below the acceptable goal of profitability"; that Larson's $78,000 salary yielded

a target revenue of $234,000 in 2011; that Larson "finished the year at $170,000 which is

over $60,000 short of [her] 2011 goal"; and that Larson's revenues in 2010 were

$111,644, "over $120,000 short of goal."  The plan noted several other performance

issues.

One week later, Larson responded to the plan.  With regard to profitability, she

noted that she had reached her premium goal in 2011; that she had not been told she had

to reach profitability in 2011; that she had been consistently told to keep doing what she

was doing; that premium production increased by approximately $1 million per year; that

she would reach profitability with an additional $60,000 in revenue in 2012; that revenue

is typically delayed in workers' compensation; and that 2012 was off to a strong start.

After addressing the remainder of the plan, Larson asked whether her revenue goal could

be adjusted.

On May 24, 2012, Lynch and Kathy Johnson, who worked as an accountant from 2008 to September 2011 and the operations manager after September 2011, met with Larson to inform Larson of her termination.  A memorandum from Lynch to Larson stated that, within the last 30 days, Larson had "not [met her] production income goals" and had "not increased [her] production activity significantly to warrant continued employment."

According to Larson's deposition testimony, Larson's age was first raised at her termination meeting, and it was Larson herself who mentioned it.  Larson stated that RPS was going to hire someone half her age at half her salary to do her job.  According to Larson, neither Lynch nor Johnson disputed the statement, and Johnson responded, "What does that have to do with it?"  At her deposition, Johnson recalled Larson had stated that RPS was going to terminate her and replace her with three people half her age. Johnson responded, "We could."  After Larson's termination, an underwriting assistant who was 33 years old took the workers' compensation underwriter position.

Approximately one month after her termination, Larson submitted a claim for a severance.  Larson devoted a substantial part of the 25-page claim to her assertion that she was terminated because she had reported an alleged affair between Lynch and an employee of RPS.  She repeatedly wrote, "I joined those who reported [Lynch] and believe I lost my job because of it."  In her 25-page claim, Larson also included allegations of age discrimination.  For example, Larson wrote:

> I specifically stated to [Lynch] and . . . Johnson in my termination session it was their intent that they would hire someone for half price and half my age to do my job and they did not dispute the statement.  After all,

8

> [Lynch] told me I was making too much money.  Age discrimination at its
> worst.

Larson also wrote, "Terminating me allowed [Lynch] to get 2-3 newly appointed people

inexperienced way less than ½ my age less money.  Age discrimination so sad!"

Similarly, Larson stated that "[i]t is **<u>discrimination</u>** for [Johnson] and [Lynch] to have

agreed with the statement that someone else can do my job at ½ my age and at ½ my

salary."

Revenue attributed to Larson in 2012 amounted to $77,952.  Revenue attributed to

her replacement in 2012 amounted to $166,142.  In 2013, revenue attributed to Larson's

replacement amounted to $199,156, which was more than four times the replacement's

salary.

Larson testified that the revenue figures on which RPS relied to evaluate her

performance are incorrect.  She maintained that they omitted fees, but she was unable to

testify to what she thought her revenues were in 2009, 2010, 2011, or 2012.  Johnson

testified that fees were included in the revenue figures on which RPS evaluated her

performance.  Even if fees were omitted from the revenue figures that RPS used to

evaluate Larson's performance, the 2011 revenue claimed by Larson herself in her 2011-

12 performance review—$226,890—fell short of the three-times-salary goal.  It may be

that Larson's revenues would have exceeded three times her salary in 2012 had she

worked the entire year.  The sum of the revenues attributed to Larson and those attributed

to her replacement in 2012 exceeded three times Larson's salary.  And it may be that

Larson would have fallen short of the three-times-salary goal in 2013 had she remained at

RPS.  Revenues attributed to her replacement in 2013, for which Larson claimed most of the credit,[2] were less than $200,000.  In any case, for the year preceding her termination, Larson did not satisfy the three-times-salary standard.  Through almost five months of 2012, RPS attributed revenues to Larson that essentially equaled her salary.  RPS gave Larson several years to establish a profitable line of business, and she did not do so.  Larson has not submitted evidence that raises a genuine issue of material fact about her lack of profitability.  *See Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 730 (8th Cir. 2002) ("Calder points out that some of the mistakes that management accused her of were not her fault but were the result of errors on the part of personnel in other divisions of the company in not properly crediting her with her sales or in improperly reading her advertising orders.  At most, however, this evidence demonstrates only that the management may have been misguided as to some of the reasons for terminating Calder, not that they discriminated against her.").

That RPS replaced Larson with a 33-year-old person does not establish that the proffered reasons for her termination were pretexts for age discrimination.  *See Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007) ("Although Carraher was replaced by someone substantially younger than him, in this case 28 years younger, we have previously held that this fact, though necessary to establish a prima facie case, possesses 'insufficient probative value to persuade a reasonable jury that [plaintiff] was

---

[2]      In her memorandum, Larson wrote, "[A]s Defendant calculates revenue generated by [the replacement] for the year 2013, its gives [the replacement] credit for all of the revenue (even though much of it was the result of Larson's work in building business)."  Similarly, Larson wrote, "[The replacement's] revenue number of $199,000.00 for 2013 was actually the result of Larson's efforts the year prior."

discriminated against.'"). Nor does the exchange that took place at Larson's termination meeting about replacing her with a younger person at a lesser salary. *See Brown v. McDonnell Douglas Corp.*, 113 F.3d 139, 142 (8th Cir. 1997) ("We also reject Brown's assertion that Ruethain's alleged statement that he 'could have hired a young college graduate' at half of Brown's salary was direct evidence of age bias. In context, it is clear that Ruethain was concerned with Brown's performance as compared to his high salary, not as compared to his age.").

The statistical evidence proffered by Larson does not demonstrate that the reasons for her termination were pretexts for age discrimination. She incorrectly stated that the average age of employees decreased from 46 to 37 years under Lynch's direction between 2009 and 2014. Elsewhere, she asserted that the average age of employees hired since Lynch started was 37 years. The average age fluctuated a few years. Larson has not shown the slight fluctuation in the average age of employees during Lynch's tenure creates a reasonable inference that she was terminated because of her age, and she has not shown that the average age of employees hired during Lynch's tenure creates a reasonable inference that she was terminated because of her age. Moreover, she did not demonstrate the significance of the statistics on which she relied. *See Carraher*, 503 F.3d at 719; *Bennett v. Watters*, 260 F.3d 925, 930 (8th Cir. 2001); *Albertson v. FMC Corp.*, 437 N.W.2d 113, 116-17 (Minn. Ct. App. 1989).

Larson asserted that she had a positive employment history. In light of her lack of profitability, her positive employment history is insufficient to create a genuine issue of material fact regarding pretext and age discrimination. *See Lewis v. St. Cloud State*

*Univ.*, 467 F.3d 1133, 1137-38 (8th Cir. 2006); *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005).

Larson claimed that a trend of hiring younger employees and firing older employees created an inference of age discrimination.  In particular, she asserted that four older employees were terminated in 2012 and that younger employees were hired that same year.  During Lynch's tenure, RPS has hired individuals whose ages span a wide range.  In 2008, RPS hired two people in the fifties and one person in the forties.  In 2009, RPS hired a person in the twenties, a person in the forties, and a person in the fifties.  In 2010, RPS hired a person in the thirties.  In 2011, RPS hired another person in the thirties.  In 2012, RPS hired two people in the twenties, three people in the thirties, one person in the forties, and one person in the fifties.  The person in the fifties was hired less than two months before Larson's termination.  In 2013, RPS hired a 19-year-old person, as well as individuals in the twenties, thirties, and fifties.  The hiring in 2013 of the person in the fifties took place less than six months after the last termination in 2012 noted by Larson.  The pattern of hiring and firing on which Larson relied does not demonstrate that RPS's reasons for her termination were pretexts for age discrimination. *See Carraher*, 503 F.3d at 719; *Vaughn v. Roadway Express, Inc.*, 164 F.3d 1087, 1091 (8th Cir. 1998).

Larson maintained that RPS favored younger, similarly-situated employees.  "At the pretext stage, the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014) (en banc).  Larson must demonstrate that she and the employees

outside of her protected group were similarly situated in all relevant respects. *Id.*; *see Ridout*, 716 F.3d at 1085 ("The similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone." (internal quotation marks omitted)). Larson noted that revenue attributed to her replacement in 2013 declined and that the replacement was neither disciplined nor terminated.  But, as noted above, revenue in 2013 was more than four times the replacement's salary.  Thus, the replacement satisfied RPS's profitability standard.  Larson also noted that a 49-year-old underwriter whose 2012 revenues exceeded three times her salary was terminated in November 2012 and that an underwriter in her thirties whose revenues did not exceed three times her salary in 2012 or 2013 was not terminated.  Although the 49-year-old underwriter's 2012 revenues exceeded three times her salary, the underwriter received a large percentage of her business from two carriers that expressed frustration with the underwriter's low volume and cancelled their contracts.  Larson has not pointed to any evidence that the younger underwriter faced comparably bleak business prospects in 2013 or that the younger underwriter was the subject of client complaints akin to those made about Larson.

Larson claimed that Lynch generally treated younger people better than older people.  But Larson admitted that at least two older women were among those Larson called Lynch's "pets" or "buddies."  Larson also pointed to turmoil surrounding the alleged affair between Lynch and an employee, the distractions caused by the employee's divorce proceedings, disparate discipline due to texting and e-mails, and invitations to sporting events or happy hours.  None of this evidence creates an inference that the proffered reasons for Larson's termination were pretexts for age discrimination.

Viewing the record in the light most favorable to Larson, the Court concludes that she has not submitted evidence that raises a genuine issue of material fact as to whether the proffered reasons for her termination were pretexts for age discrimination. The Court therefore grants Gallagher and RPS's motion for summary judgment on Larson's claim of age discrimination.

### Dau

For almost all of her time at the Schneider Agency and RPS, Dau worked as an underwriter assistant. In approximately 2003, she started to work for Steven Libor as an underwriter assistant, and she continued to work for Libor, as well as other underwriters, until her termination in 2012. RPS offered the following legitimate, nondiscriminatory reasons for her termination:

> Dau would not do the job duties RPS and Libor needed her to do, and when she was asked to do her job she complained and had a negative attitude about the changes – to the point that she stopped communicating with her boss, Libor. She even admits she had a negative attitude, and even told her boss Libor, "I don't care." Instead of taking the opportunity to correct her performance and behavior when she received a [performance improvement plan], Dau made absolutely no effort to improve her performance and maintained her "silent treatment" of Libor. As a result, RPS decided to terminate Dau's employment.

The parties disputed whether Dau demonstrated that RPS's reasons for her termination were pretexts for age discrimination. Dau asserted that she had a positive employment history, that her termination had no basis in fact, and that RPS favored younger, similarly-situated employees. Dau also asserted that the basis of her termination was subjective.

14

Dau's reviews in the few years that preceded her termination were mostly positive. In her 2009-10 review, which Dau and Schneider signed on March 31, 2010, her overall rating was "Highly Valued."  In her 2010-11 review, which Dau and Lynch signed on March 31, 2011, her overall rating was "Valued Talent."  On five of six "Shared Values," Lynch rated Dau as "Solid Values."  On one, "Leadership," Lynch rated Dau as "Needs Improvement" and commented, "Does not manage anyone but can be very influential in the office and has to understand her attitude is noticed by others."  In her 2011-12 review, which Dau and Libor signed on April 11, 2012, her overall rating was "Valued Talent." Libor offered the following comments on Dau's "Performance Results":

> [Dau] is taking a lot of new initiatives to learn the new processes that help her do her job.  Looking for this year to be a highly productive new business year, so will need to learn more of the responsibilities of an underwriting assistant.  Underwriting assistants need to be reviewing renewal list, increase agent contact in requesting renewal applications, answering calls in underwriters absence (sending out new business applications), assisting in the overall growth in new business as well as working the renewal business to free up underwriters time.  Utilize service center to free up time.

On four of six "Shared Values," Libor rated Dau as "Solid Values."  On two, "Innovation & Resourcefulness" and "Integrity," Libor rated Dau "Needs Improvement."  He commented:

> Continue to learn new processes in services required of the job.  Needs to recognize job requirements are evolving into areas that require more client contact.  Recommend [Dau] sits with [an assistant] a few times to learn processes expected of underwriting assistant.  ([The assistant] brings experience from agency and brokerage business which could be very valuable).

On "Development Needs," Libor commented:

With the new service center will have time to become more proficient with AIM, learn additional processes that will help in growth within departments.  More client contact, renewal list management, assist in client contact for underwriters.  Keep up with and learn suspense process so I can use to send notice of accounts needing service.

In early May 2012, Lynch informed Dau that she was going to receive a raise.  A couple of days later, Libor sent an e-mail to Lynch in which Libor noted improvements in Dau's performance:

Wanted to drop you a quick note to let you know that I have witnessed some very strong improvements in [Dau's] attitude and "ownership" type involvement in our book of business.  Going out of her way to ask questions on how to improve the renewal process, why we do things certain ways, and taking the [initiative to] contact out agents directly.  I am sure within the next few months our relationship will be like clockwork which will result in a growth in "our" book of business.

Later that year, Lynch asked Dau why she was not working for the workers' compensation underwriter whom she supported.  Dau responded Libor had instructed her that his work came first and that she should do his work before assisting anybody else.  According to Dau, Lynch called Libor, who denied he had so instructed Dau.  Libor seemed "flustered" and "upset" to Dau.  The next day, Libor sat next to Dau in the office without speaking a word to her.  Dau testified "that was the beginning of the end of -- you know, [Libor] did not like me telling [Lynch] what he had done, and that was, you know, like a week before I got written up, and that was it."

On August 17, 2012, Libor talked to Dau about completing renewal applications and suspense items.  Dau responded that she did not have time to complete them and that she had to prepare binders and invoices.  Libor told her that she had to do them and that it

was her job to do them.  Dau responded, "I don't care."  She also said, "I have to do all

your work--I have to do all of [the workers' compensation underwriter's] work."

That morning, Libor sent an e-mail to Johnson that summarized his conversation

with Dau.  Libor indicated he could no longer work with Dau.  He raised several concerns

about her ability to assist him.  Johnson forwarded the message to human resources.  She

asked whether anything in Libor's e-mail constituted grounds for immediate termination,

"guess[ed] no," and "hop[ed] yes."

Later on August 17, the workers' compensation underwriter sent an e-mail to

Johnson.  The underwriter stated, "[Dau] is not processing my work – she has emails

from me for items to due from back in July – I have attached a screen print but I can't fit

all of them on one page."  The underwriter asked Dau about suspense items, and Dau

responded she did not have time to do them.  The underwriter expressed that Dau had "a

very negative outlook on any change, and it seems about anything to do with work in

general."

On August 20, 2012, Johnson and Libor presented a performance improvement

plan to Dau.  The plan noted six problems with Dau's work performance: (1) failure to

process renewal applications for certain policies; (2) failure to timely complete binders

and invoices; (3) failure to resolve suspense items; (4) invoice mistakenly issued; (5)

"[a]gent requests for information which could easily be handled by an assistant by

looking up the information in AIM are directed to [Libor]"; and (6) "[d]oes not

communicate with underwriters that deadlines are not met."  The plan also noted four

items regarding Dau's negative attitude: (1) "[r]efusing to speak to [Libor] for unknown

reasons"; (2) "[n]egative attitude toward changes within the organization"; (3)

"[s]pending time gossiping with other employees"; and (4) "[n]egative attitude in

meetings."

The next day, Johnson sent an e-mail to human resources and Lynch:

The rumor mill has it that [Dau] wants to be fired so that she can be on unemployment.  Which would then run out about the time she can draw Social Security.  Obviously just a rumor.  But she still is not speaking to her direct manager, Steve Libor.

Do we need to wait until 9/4/12 [when a meeting was scheduled to review Dau's performance] to terminate?

One week later, Johnson wrote an e-mail to human resources regarding Dau's

termination.  Lynch and Libor received copies.  The e-mail stated:

We are moving ahead with [Dau's] termination effective 8/30/12.

Situation has not improved with her performance:

1.  Still is not speaking to her manager Steve Libor

2.  Yesterday told someone from Taylor Insurance that she could not help them submit an application to one of our common markets.  This was one of the things that was specifically mentioned to [Dau] when she was placed on PIP.  Helping people is her job

3.  She has not worked on any of the rushes given to her by our WC underwriter . . . .

We need to move ahead with termination and find an employee that is willing to do his/her job.

On August 30, 2012, Dau was terminated.  Approximately one week later, RPS replaced

Dau with a 23-year-old woman.

In September 2012, Dau wrote notes to herself about her employment and termination by RPS.  Dau did not mention age discrimination in her notes.  At her deposition, Dau testified that she did not know the age of her replacement when she wrote the notes and that she thought she was the victim of age discrimination after learning the age of her replacement.  She also testified that there were many reasons for her termination.  Dau testified that Lynch fired older people so that he could hire young, attractive women.  Next, the employee with whom Lynch was allegedly having an affair was divorcing her husband.  Dau wrote a letter in August 2012 in support of the husband regarding child custody.  Dau testified that she was terminated in retaliation for writing the letter.  In addition, Dau testified that Lynch terminated her so that he could replace her with the friend of an employee with whom he allegedly had sex.  Dau also testified that she was terminated because she had told Lynch about Libor's directive to do his work first.  Dau acknowledged that her age was not mentioned during her termination.

Dau disputed the reasons for termination given by Johnson in the August 28 e-mail and most of the reasons given for the August 20 performance improvement plan.  With regard to the reasons given in the August 28 e-mail, Dau testified that she did talk to Libor about business, but she did not speak to him socially;[3] that she had never heard of Taylor Insurance; that she had not been asked to help with submission of an application; that she did not know what the third item was; and that she had completed the "follow-ups" given to her by the workers' compensation underwriter.  Even if Dau raised doubts

_____

[3]     The notes that Dau wrote in September 2012 indicate that her relationship with Libor was "strained" after Lynch had talked to Libor about Libor's instruction to do his work first.

about the reasons for her termination, she must demonstrate that the circumstances permit a reasonable inference of age discrimination.  *See Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008).

That Dau's replacement was substantially younger does not establish that the proffered reasons for her termination were pretexts for age discrimination.  *See Carraher*, 503 F.3d at 719.  Nor do Dau's positive reviews given the undisputed strain in the working relationship between Dau and Libor that arose after her last review.  *See Lewis*, 467 F.3d at 1137-38.  Dau asserted that statistical evidence and a pattern of hiring and firing creates an inference of age discrimination.  For essentially the same reasons set forth in the discussion of Larson's claim of age discrimination, Dau has not demonstrated that either statistical evidence or a pattern of hiring and firing supports a reasonable inference of age discrimination.  Dau noted that Libor had commented about the appearance of his fellow co-workers and that Libor had used a picture of Jennifer Aniston as his computer's wallpaper.  Dau testified that Libor used Aniston's picture many years before her termination.  His comments about the appearance of his fellow co-workers and his use of Aniston's picture do not give rise to an inference of age discrimination.  *See Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876-77 (8th Cir. 2008).  Dau has not identified a younger, similarly-situated employee who received better treatment.  She compared herself to the employee with whom Lynch was allegedly having an affair.  The employee cursed at Dau after learning Dau had received a message from the employee's husband. The employee apparently was not disciplined for cursing at Dau.  Later, Dau told other employees she was going to "crucify" the employee in the employee's divorce

proceedings.  No discipline was imposed on Dau for this remark.  There is no evidence that the employee engaged in comparable insubordination as Dau had.  The rest of the evidence on which Dau relied to demonstrate younger, similarly-situated employees received favorable treatment fails for essentially the same reasons set forth above in the discussion of Larson's claim of age discrimination.

Viewing the record in the light most favorable to Dau, the Court concludes that she has not submitted evidence that raises a genuine issue of material fact as to whether the proffered reasons for her termination were pretexts for age discrimination.  The Court therefore grants Gallagher and RPS's motion for summary judgment on Dau's claim of age discrimination.

### *Conclusion*

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Gallagher and RPS's motions for summary judgment [Docket No. 24 in Civil No. 13-1506 and Docket No. 24 in Civil No. 13-1560] are GRANTED.

2. Count IV of Larson's Complaint in Civil No. 13-1506 is DISMISSED WITH PREJUDICE.

3. Count IV of Dau's Complaint in Civil No. 13-1560 is DISMISSED WITH PREJUDICE.

Dated: December 4, 2014

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge